JMK:AES/DGR
F. #2020R00926

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

GOLDMAN SACHS (MALAYSIA)
SDN. BHD.,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. <u>20-438 (MKB)</u>
(T. 18, U.S.C., §§ 371 and 3551 <u>et</u> <u>seq.</u>)

THE UNITED STATES CHARGES:

        At all times relevant to this Information, unless otherwise stated:

I.      <u>The Defendant and Relevant Individuals and Entities</u>

        1.      From in or about and between 2009 and at least 2014 (the "relevant time period"), The Goldman Sachs Group (together with its wholly-owned subsidiaries and affiliated entities, "Goldman" or the "Company") was a global investment banking, securities and investment management firm incorporated in Delaware and headquartered in New York, New York.   Accordingly, during the relevant time period, Goldman was a "United States person" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1(g).   Goldman had a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, Section 78l) and was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC").   Accordingly, during the relevant time period, Goldman was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1.   Goldman operated worldwide primarily through

wholly-owned subsidiaries and affiliated entities.   Goldman and its subsidiaries and affiliated entities, combined, had approximately 38,000 employees.

2.      The defendant GOLDMAN SACHS (MALAYSIA) SDN. BHD. ("GOLDMAN MALAYSIA") was a wholly-owned subsidiary and agent of Goldman. GOLDMAN MALAYSIA was incorporated in Malaysia and had offices in Kuala Lumpur. GOLDMAN MALAYSIA's records and accounts were included in Goldman's consolidated financial statements to the SEC.   GOLDMAN MALAYSIA also received revenue related to the relevant transactions described more fully below.   During the relevant time period, GOLDMAN MALAYSIA and its employees and directors were agents of an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1.

3.      Goldman Sachs (Singapore) Pte., Goldman Sachs International, Goldman Sachs Bank USA, Goldman Sachs & Co. L.L.C. and Goldman Sachs (Asia) L.L.C. are each Goldman subsidiaries, and they and their employees were agents of Goldman that assisted in carrying out business around the world, including the relevant transactions and conduct set forth herein.   During the relevant time period, Goldman Sachs (Asia) L.L.C. was incorporated in Delaware, had offices in Hong Kong and was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2, and a "United States person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(i).

4.      Tim Leissner ("Leissner") was employed by various Goldman subsidiaries and acted as an agent and employee of Goldman with respect to the transactions and conduct set forth herein.   Leissner was employed by Goldman from in or about and between 1998 and 2016, and was a Participating Managing Director ("PMD") from in or about and between November 2006 and February 2016.   Additionally, he held various senior positions in Goldman's

Investment Banking Division in Asia from in or about and between 2011 and 2016, including Chairman of Southeast Asia, a region that included Malaysia, from in or about and between July 2014 and February 2016, and he served on the Board of Directors for the defendant GOLDMAN MALAYSIA.   Leissner's job included obtaining and executing business for Goldman.   During the relevant time period, with respect to the transactions and conduct set forth herein, Leissner was an employee and agent of an "issuer" and a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(a) and 78dd-2(a).

5.     Ng Chong Hwa, also known as "Roger Ng" ("Ng"), was employed by various Goldman subsidiaries from in or about and between 2005 and 2014, including the defendant GOLDMAN MALAYSIA, and acted as an agent and employee of Goldman with respect to the transactions and conduct set forth herein.   In or about and between April 2010 and May 2014, Ng was a Managing Director ("MD") of Goldman.   For part of that time, Ng served as Head of Investment Banking and on the Board of Directors for GOLDMAN MALAYSIA, and was then employed by another Goldman subsidiary in Malaysia.   Ng worked with Leissner on the relevant transactions, and his job included obtaining and executing business for Goldman. During the relevant time period, Ng was an employee and agent of an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

6.     "Employee 1,"[1] an individual whose identity is known to the United States and the Company, was employed by at least one Goldman subsidiary, and acted as an agent and employee of Goldman.   In or about and between October 2007 and November 2018, Employee 1 served as a PMD and, during the relevant time period, held various leadership

---

[1] The identity of Employee 1 and all other anonymized individuals and entities discussed herein are known to the United States and the defendant GOLDMAN MALAYSIA.

positions in Goldman's Asia operations.   Employee 1 worked with Leissner and Ng on the relevant transactions.   During the relevant time period, Employee 1 was an employee and agent of an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

7.     1Malaysia Development Berhad ("1MDB") was a strategic investment and development company wholly owned by the Government of Malaysia through its Ministry of Finance ("MOF").   It was formed in or about 2009 to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these projects.   1MDB was overseen by senior Malaysian government officials, was controlled by the Government of Malaysia and performed a function on behalf of Malaysia.   During the relevant time period, 1MDB was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), 78dd-3(f)(2).

8.     International Petroleum Investment Company ("IPIC") was an investment fund wholly owned by the Government of Abu Dhabi.   It was established by the Government of Abu Dhabi and was overseen by senior Abu Dhabi government officials, was controlled by the Government of Abu Dhabi and performed a government function on behalf of Abu Dhabi. During the relevant time period, IPIC was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), 78dd-3(f)(2).

9.     Aabar Investments PJS ("Aabar") was a private joint stock company incorporated under the laws of Abu Dhabi, and a subsidiary of IPIC.   During the relevant time period, Aabar was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), 78dd-3(f)(2).

4

10.     "1MDB Official 1," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.   1MDB Official 1 served as one of the principal points of contact between 1MDB and Goldman in connection with 1MDB business.   During the relevant time period, 1MDB Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

11.     "1MDB Official 2," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.   During the relevant time period, 1MDB Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

12.     "1MDB Official 3," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.   During the relevant time period, 1MDB Official 3 served as one of the principal points of contact between 1MDB and Goldman in connection with 1MDB business.   1MDB Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

13.     "1MDB Official 4," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.   During the relevant time period, 1MDB Official 4 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

14.     "1MDB Official 5," an individual whose identity is known to the United States and the Company, was an official at 1MDB.   During the relevant time period, 1MDB

Official 5 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

15.    "Malaysian Official 1," an individual whose identity is known to the United States and the Company, was a high-ranking government official in the executive branch of the Government of Malaysia and the Ministry of Finance ("MOF").   Malaysian Official 1 had authority to approve, and exert influence over, 1MDB business.   During the relevant time period, Malaysian Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

16.    "Malaysian Official 2," an individual whose identity is known to the United States and the Company, was an official in the executive branch of the Government of Malaysia and a special advisor to Malaysian Official 1.   During the relevant time period, Malaysian Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

17.    "Malaysian Official 3," an individual whose identity is known to the United States and the Company, was an official in the executive branch of the Government of Malaysia and a special advisor to Malaysian Official 1.   During the relevant time period, Malaysian Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

18.    "Malaysian Official 4," an individual whose identity is known to the United States and the Company, was an official in the executive branch of the Government of Malaysia and a special advisor to Malaysian Official 1.   During the relevant time period, Malaysian Official 4 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

19.     "Abu Dhabi Official 1," an individual whose identity is known to the United States and the Company, was a high-ranking official of IPIC and Aabar.   Abu Dhabi Official 1 had influence over and held signatory authority for IPIC.   During the relevant time period, Abu Dhabi Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

20.     "Abu Dhabi Official 2," an individual whose identity is known to the United States and the Company, was a high-ranking official of Aabar.   Abu Dhabi Official 2 had influence over and held signatory authority for Aabar.   During the relevant time period, Abu Dhabi Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

21.     During the relevant time period, Low Taek Jho, also known as "Jho Low" ("Low"), was a Malaysian national who worked as an intermediary in relation to 1MDB and other foreign government officials on numerous financial transactions and projects involving Goldman and others.

22.     During the relevant time period, "Individual 1," an individual whose identity is known to the United States and the Company, was a Malaysian national and associate of Low.

II.     The Foreign Corrupt Practices Act

23.     The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official to secure an improper advantage for the purpose of obtaining or retaining business for, or directing business to, any person.

III.    Overview of the Criminal Scheme

24.    In or about and between 2009 and 2014, Goldman, through certain of its agents and employees, including the defendant GOLDMAN MALAYSIA, together with others, knowingly and willfully conspired and agreed with others to corruptly provide payments and things of value to, or for the benefit of, foreign officials and their relatives to induce those foreign officials to influence the decisions of 1MDB, IPIC and Aabar to obtain and retain business for Goldman, including positions as an advisor to 1MDB on the acquisitions of Malaysian energy assets, underwriter of the 1MDB bonds, and underwriter of certain other 1MDB business, including the contemplated initial public offering ("IPO") of 1MDB's Malaysian energy assets.   Leissner, Ng and Employee 1 used Low's connections within the Governments of Malaysia and Abu Dhabi to obtain and retain this and other business for Goldman and, in turn, concealed Low's involvement in the deals from certain employees and agents of Goldman.   In total, Goldman conspired to provide approximately $1.6077 billion to, or for the benefit of, foreign officials and their relatives, of which approximately $18.1 million was paid from accounts controlled by Leissner.

25.    The bribes resulted in Goldman being engaged on, among other projects, three bond offerings that were related to 1MDB's energy acquisitions and that raised a total of approximately $6.5 billion for 1MDB in 2012 and 2013.   The bribes were also intended to help Goldman secure a role on the anticipated IPO of those energy assets.   These three bond offerings and a related acquisition, along with a transaction involving Low and IPIC,[2] ultimately earned Goldman in excess of $600 million in fees and revenue across its divisions, and increased

_____

[2] This transaction involved Leissner, Employee 1, Low and IPIC, and Low's monetary contribution to this deal involved funds misappropriated from the bond offerings.

Goldman's stature in Southeast Asia.   In the course of this scheme, payments and communications made in furtherance of the scheme were made via wires that passed through the Eastern District of New York.

26.     Pursuant to Goldman's internal accounting controls, each 1MDB bond transaction required Goldman management's general and specific authorization.   Moreover, because Goldman initially purchased the full value of each bond from 1MDB using Goldman's assets, the transactions needed to be appropriately authorized and properly recorded.   Among other things, Goldman's internal accounting controls included the Firmwide Capital Committee ("FWCC"), which was authorized by Goldman's Chief Executive Officer to provide global oversight and approval of bond transactions, including those transactions in which Goldman used its own assets to purchase the financial instruments, like the 1MDB bonds.   Goldman's internal accounting controls also included approval of the bonds by Goldman's Business Intelligence Group ("BIG") and compliance, both of which were represented on the FWCC.   While certain of Goldman's employees and agents, including Leissner, Ng and Employee 1, circumvented these and other controls, other Goldman employees and agents who were responsible for implementing its internal accounting controls failed to do so in connection with the 1MDB bond deals.   Specifically, although employees serving as part of Goldman's control functions knew that any transaction involving Low posed a significant risk, and although they were on notice that he was involved in the transactions, they did not take reasonable steps to ensure that Low was not involved.   Additionally, there were significant red flags raised during the due diligence process and afterward, including, but not limited to, Low's involvement in the deals, that were either ignored or only nominally addressed so that the transactions would be approved and Goldman could continue to do business with 1MDB.

IV.     Goldman's Relationship with Low

27.     In or about 2009, Leissner and Ng were introduced to Low, who was known to be close to various high-ranking officials in Malaysia and Abu Dhabi, and through Low began cultivating relationships with Malaysian Official 1 and others to secure business for Goldman.

28.     In or about January 2009, Leissner and Ng discussed with Low and others a role for Goldman in the creation of and potential fundraising for Terengganu Investment Authority ("TIA"), 1MDB's predecessor entity.

29.     Leissner and Ng also attempted to onboard Low as a Goldman client, or otherwise work with Low, on numerous occasions in or about and between 2009 and 2013.   For example, in or about September 2009, Ng referred Low for a private wealth management account ("PWM") through a Goldman European subsidiary.   Ng described Low as "our partner in a lot of transactions in [M]alaysia.   Largely the mid-east and [M]alaysia rationship [sic]."   As part of the onboarding process, Goldman's control functions, including BIG, vetted Low's finances and raised questions about his source of wealth.   As control functions personnel worked to diligence those questions about Low, the business side continued to pressure them to approve Low as a client.   In a March 13, 2010 email, a Goldman regional head of compliance wrote to a high-level BIG executive and others, expressing frustration with the pressure to approve Low and underscoring the red flags Low raised as a client:

> This has been an exceptionally trying experience I have to admit, and I believe that no matter what we do [Goldman PWM representative] is not willing to accept that we are not in a position to onboard this prospect . . . I do not believe we will ever be able to get comfortable with this matter. I'd like to shut this down once and for all . . . It is seldom that one sees a vendor report, which has been backed up verbally by them, that so clearly states that we should exercise extreme caution.

30.     Ultimately, BIG personnel rejected Low as a Goldman client because of his inability to satisfactorily answer questions raised by Goldman's control functions, as well as negative news coverage about Low's lavish spending.   Notwithstanding this rejection, there were additional attempts to onboard Low and his companies as a Goldman client.

31.     For example, in early 2011, Leissner tried to onboard two of Low's companies as clients of Goldman but was unable to do so due to compliance's continued objections to Low.

32.     Around the same time, Leissner made an additional attempt to bring Low on as a PWM client through Goldman's Singapore office, without referencing the prior attempt. Low was again denied due to, among other things, his questionable source of wealth.   In a March 11, 2011 email chain discussing the attempt, a high-ranking employee in compliance and MD noted, "To be clear, we have pretty much zero appetite for a relationship with this individual," and a high-ranking employee in BIG and MD expressed, "this is a name to be avoided."

V.    Goldman's Three Bond Transactions for 1MDB

33.     Even after the control functions had rejected Low as a client, Leissner, Ng and others at Goldman continued their relationship with Low and used him to obtain and retain business for Goldman from 1MDB and others.   In or about and between 2012 and 2013, Leissner, Ng, Employee 1 and other Goldman employees worked with Low to help 1MDB raise more than $6.5 billion via three separate bond offering transactions, referred to internally at Goldman as "Project Magnolia," "Project Maximus" and "Project Catalyze," respectively.

A.     Project Magnolia

34.     In or about February 2012, 1MDB engaged Goldman as its financial advisor for its anticipated purchase of a Malaysian energy company ("Malaysian Energy Company A").   Low helped secure Goldman's role in that transaction.

35.     On or about January 23, 2012, Low arranged a meeting between Leissner, Ng and a high-ranking 1MDB official.   In making the arrangements, Low emailed all three at their personal email addresses, and stated "Making an introduction to [Leissner] and [Ng]'s private e-mail accounts [….] Please exclude me from the e-mail list going forward."   Thereafter, Leissner and Ng worked with the high-ranking 1MDB official on the potential purchase of Malaysian Energy Company A.

36.     1MDB was also interested in raising funds to acquire Malaysian Energy Company A, including through a bond transaction.   In or about early 2012, Leissner, Ng, 1MDB Official 1, 1MDB Official 3, Low and others met in Malaysia to discuss the necessity of a guarantee from IPIC to make the bond transaction feasible for Goldman, which would purchase all of the bonds initially, and then sell the bonds to other investors.

37.     In or about February 2012, Leissner and Ng traveled to London to meet with Low and others to discuss the proposed bond transaction.   Leissner and Ng utilized Goldman resources to fund their travel to London.

38.     At that meeting, Low explained that government officials from Abu Dhabi and Malaysia needed to be bribed to both obtain the guarantee from IPIC and get the necessary approvals from Malaysia and 1MDB.   Low advised that a high-ranking official of IPIC ("IPIC Official 1") and Malaysian Official 1 needed to be paid the largest bribes out of all the government officials to approve the transaction, and that other lower-level officials would need to be bribed as well.

39.     Subsequently, Leissner and Ng each separately informed Employee 1 about the information they had learned at the London meeting regarding the need to bribe foreign officials.

40.     Low also promised remuneration to various 1MDB officials to facilitate the deals and to ensure Goldman's role in those deals.   For example, on or about March 8, 2012, 1MDB Official 1 emailed himself a copy of an online chat he had with Low on or about March 8, 2012, in which they discussed, among other things, Malaysian Energy Company A.   In that chat, Low told 1MDB Official 1 that he would give 1MDB Official 1 a "big present" when the Malaysian Energy Company A transaction was completed and then directed 1MDB Official 1 to "delete from email and destroy once done."

41.     On or about March 5, 2012, Leissner, Ng, Employee 1, Low and others traveled to Abu Dhabi to meet with IPIC and Aabar representatives regarding the potential debt financing that would assist 1MDB in raising funds for the acquisition of Malaysian Energy Company A.   During the same trip, Low arranged a meeting between Leissner and IPIC Official 1, during which Leissner delivered a letter from Malaysian Official 1 addressed to IPIC Official 1.

42.     On or about March 19, 2012, 1MDB formally chose Goldman as the "sole bookrunner and arranger" for the $1.75 billion debt financing transaction designed, in part, to pay $822 million towards Malaysian Energy Company A's acquisition.   IPIC was chosen to serve as guarantor on the bond and Aabar was granted certain options by the 1MDB issuer for assistance in securing the guarantee.

43.     One of Goldman's goals in pursuing this transaction was to secure more business for itself, including a role in the potential IPO of 1MDB's energy assets, as explicitly

stated in Goldman's FWCC memorandum circulated during the approval process for Project

Magnolia:   "Post closing, we expect significant follow on business from 1MDB and 1MDB

Energy[,] including the IPO of 1MDB Energy."

44.     As work progressed on Project Magnolia, between on or about March 25,

2012 and on or about March 29, 2012, Leissner and Ng traveled to Los Angeles, California and

New York, New York to discuss matters related to Project Magnolia with Low and others.

Leissner and Ng traveled using Goldman resources.

45.     Meanwhile, although employees within Goldman's control functions

suspected that Low may be involved in the deal, the only step taken by the control functions to

investigate that suspicion was to ask members of the deal team whether Low was involved and to

accept their denials without reasonable confirmation.

46.     For example, during a telephone call in or about March 2012, a high-

ranking employee in BIG and MD voiced suspicions that Low was involved in Project Magnolia.

Leissner denied that Low was involved.   Similarly, on or about April 3, 2012, the day before a

FWCC meeting to discuss Project Magnolia, a high-ranking executive in BIG, who was also an

advisor to the FWCC ("Employee 2"), emailed other members of BIG that "Leissner said Jho

Low not involved at all in deal as far as he [is] aware but that Low was present when Leissner

met [IPIC Official 1] in Abu Dhabi."

47.     On or about April 4, 2012, the FWCC meeting was held, which was

attended telephonically by Goldman executives in New York, New York.   During this meeting,

Leissner was asked whether Low was involved in Project Magnolia and Leissner said that, other

than arranging a meeting between Leissner and IPIC Official 1, Low was not involved.   Ng was

also present during this meeting and did not correct Leissner's false statement about Low's

involvement.   Later that same day, after the FWCC meeting, Employee 2 emailed Leissner, stating "I was told Jho Low attended the meeting you had with [IPIC Official 1] . . . that was wrong."   Leissner responded that he "hand delivered a letter by the Prime Minister of Malaysia to [IPIC Official 1] and the Crown Prince."   Employee 2 replied, "I guess Low will have had a hand in fixing that you were able to carry the letter from the Malaysian PM . . . Important we have no role on our side for Low and we should ask that any payments from any of [the] participants to any intermediaries are declared and transparent."   Leissner agreed with Employee 2's admonishment.

48.     Goldman's control functions accepted the statements of the deal team members about Low's involvement at face value, rather than taking additional steps that Goldman's control functions took in other deals, such as reviewing the electronic communications of members of the deal team to look for evidence of Low's involvement (e.g., searching for references to Low).   For example, had Goldman conducted a review of Leissner's electronic communications at this time, it would have discovered multiple messages linking Low to, among others, the bond deal, 1MDB officials, Malaysian Official 1 and Abu Dhabi Official 1, as well as the use of personal email addresses by Leissner and Ng to discuss Goldman business.

49.     During this time period, Low, Leissner and Ng continued to structure the bribery scheme.   Leissner and Ng ultimately understood that Low intended to use the funds raised through Project Magnolia to pay bribes, and cause bribes to be paid, to foreign officials in Malaysia and Abu Dhabi to influence those officials to obtain the necessary approvals and assistance for Goldman to execute Project Magnolia.

50.     On or about May 16, 2012, Goldman's committees approved Project Magnolia, and on or about May 21, 2012, the $1.75 billion bond issuance closed.   Goldman purchased the entire bond issuance from 1MDB.

51.     On or about May 22, 2012, Goldman caused approximately $907,500,000 in proceeds from Project Magnolia to be wired to a 1MDB subsidiary ("1MDB Subsidiary 1"), through a correspondent bank account in New York, New York.   Goldman booked approximately $192,500,000 in fees for this bond transaction and an additional approximately $16,800,000 in fees for advising on the acquisition of Malaysian Energy Company A.

52.     Low and others caused the following transfers of funds from the proceeds of Project Magnolia:

a.     On or about May 22, 2012, approximately $576,943,490 of the Project Magnolia bond proceeds were transferred from the account of 1MDB Subsidiary 1 to an account at Foreign Financial Institution A ("Shell Company Account 1") in the name of a company incorporated in the British Virgin Islands with a name similar to Aabar ("Shell Company 1").   However, Shell Company 1 was not, in fact, associated with Aabar but was rather associated with Abu Dhabi Official 1, Abu Dhabi Official 2 and Low.   Abu Dhabi Official 1 and Abu Dhabi Official 2 were signatories on Shell Company Account 1, and Low exercised control over Shell Company Account 1.

b.     On or about May 25, 2012, approximately $295 million was transferred via wire from Shell Company Account 1 to an account at a foreign bank in the name of a shell company beneficially owned and controlled by Low and Individual 1 ("Shell Company Account 2").   On or about July 25, 2012, another approximately $133 million was transferred via wire from Shell Company Account 1 to Shell Company Account 2.

c.      On or about June 18, 2012, approximately $133 million was transferred from Shell Company Account 1 to an account at Foreign Financial Institution A, opened in the name of a company incorporated in the British Virgin Islands and beneficially owned and controlled by a close relative of Malaysian Official 1 ("Shell Company Account 3"). Between on or about August 8, 2012 and on or about August 22, 2012, another approximately $16 million was transferred from Shell Company Account 2 through another shell company to Shell Company Account 3.

d.      Between on or about June 20, 2012 and on or about November 20, 2012, approximately $60 million was transferred over multiple wires from Shell Company Account 3 to the account of U.S. Motion Picture Company 1, an account at U.S. Financial Institution 1 in Los Angeles, California ("Holding Company 1 Account").   U.S. Motion Picture Company 1 was a U.S. legal entity owned, in part, by a close relative of Malaysian Official 1, and the funds transferred from Shell Company Account 3 to Holding Company 1 Account were used to, among other things, finance movie productions.

e.      Between on or about May 29, 2012 and on or about August 1, 2012, approximately $258.75 million was transferred via wire from Shell Company Account 2 to an account at Foreign Financial Institution B in the name of Shell Company Account 4, which was beneficially owned and controlled by Abu Dhabi Official 1.

f.      Also between on or about May 29, 2012 and on or about July 13, 2012, approximately $35 million was transferred via wire from Shell Company Account 2 to an account at Foreign Financial Institution C in the name of Shell Company Account 5, which was beneficially owned and controlled by Abu Dhabi Official 2.

g.      Between on or about June 15, 2012 and on or about July 9, 2012, a total of approximately $1.6 million was transferred from Shell Company Account 2 through another shell company account to an account at Foreign Financial Institution D that was beneficially owned and controlled by 1MDB Official 3.

h.      Between on or about June 11, 2012 and on or about July 16, 2012, approximately $51.96 million was transferred via wire through the United States from Shell Company Account 2 to Holding Company 2 Account, which was beneficially owned and controlled by Leissner and his close relative, and, in turn, approximately $24.4 million was subsequently transferred from Holding Company 2 Account to an account at Foreign Financial Institution E beneficially owned by Ng's relative ("Shell Company Account 6").[3]

### Project Maximus

53.    Within weeks of closing Project Magnolia, in or about May 2012, 1MDB sought assistance from Goldman to purchase a second Malaysian energy company ("Malaysian Energy Company B") and to issue a bond to raise funds for the acquisition.   In or about August 2012, 1MDB agreed to purchase Malaysian Energy Company B for approximately $814 million and planned to finance the purchase with another $1.75 billion bond guaranteed indirectly by IPIC.

54.    Once again, Goldman's control functions simply accepted at face value the representations of the deal team members and failed to further investigate Low's suspected involvement in this bond deal.   For example, on or about June 20, 2012, a member of Goldman's control functions asked members of the deal team, "Is Jho Low involve[d] in this

---

[3]  Based on records, the name of the company that held Shell Company Account 6 subsequently changed, but Shell Company Account 6 remained beneficially owned by Ng's relative.

transaction?   Please also keep us posted if there are any other politically exposed person involve[d] in this transaction in a non-official capacity."   A deal team member responded "no."

55.     Additionally, on or about October 10, 2012, in response to committee questions, Leissner told a firmwide committee that neither Low nor any intermediary was involved in Project Maximus.   Despite their continued concern, as evidenced by their repeated questions, Goldman's control functions did not engage in electronic surveillance of Leissner's correspondence or activities to determine whether Low was involved in the deal.

56.     Goldman's continued control failures were further compounded when Goldman ignored additional red flags raised by Project Maximus, including that 1MDB was seeking to raise additional funds within a few months of raising $1.75 billion via Project Magnolia without having utilized the full amount from that deal, and was also seeking to raise far more than was needed to acquire Malaysian Energy Company B.   Goldman's control functions also failed to verify how Project Magnolia's proceeds were used.

57.     On or about October 19, 2012, Project Maximus closed.   Goldman purchased the entire bond issuance from 1MDB.   On or about October 19, 2012, Goldman caused approximately $1.64 billion to be transferred via wire through correspondent accounts in the United States to another 1MDB subsidiary ("1MDB Subsidiary 2").   Goldman booked approximately $110,000,000 in fees for Project Maximus.

58.     Low and others caused the following transfers of funds from the proceeds of Project Maximus:

a.     On or about October 19, 2012, approximately $790,354,855 was transferred from 1MDB Subsidiary 2 to Shell Company Account 1.

b.      Between on or about October 24, 2012 and on or about December 17, 2012, approximately $664 million was transferred from Shell Company Account 1 to Shell Company Account 2.

c.      Between on or about October 23, 2012 and on or about November 14, 2012, approximately $106.2 million was transferred from Shell Company Account 1 to Shell Company Account 3, which was beneficially owned and controlled by a close relative of Malaysian Official 1.

d.      Between on or about October 30, 2012 and on or about November 19, 2012, approximately $30 million was transferred from Shell Company Account 2 to an account held by Malaysian Official 1.

e.      Between on or about October 29, 2012 and on or about November 30, 2012, approximately $214 million was transferred from Shell Company Account 2 to Shell Company Account 4, which was beneficially owned and controlled by Abu Dhabi Official 1.

f.      Between on or about July 3, 2012 and on or about December 19, 2012, approximately $21 million was transferred from Shell Company Account 2 and another shell entity to an account beneficially owned and controlled by an official in the government of the United Arab Emirates ("UAE Official 1").

g.      Between on or about November 2, 2012 and on or about January 22, 2013, approximately $31.6 million was transferred from Shell Company Account 2 to Shell Company Account 5 and another account beneficially owned and controlled by Abu Dhabi Official 2 and his close relative.

h.      On or about December 6, 2012, approximately $5 million was transferred from Shell Company Account 2 to an account beneficially owned and controlled by 1MDB Official 3.

i.      Between on or about December 6, 2012 and on or about January 21, 2013, approximately $20.5 million was transferred from Shell Company Account 2 to Holding Company 2 Account.

59.     Leissner then directed follow-on transfers from Holding Company 2 Account to government officials and others.   For example, on or about December 4, 2012, Leissner emailed his close relative from his personal account with bank account details and amounts to be wired from Holding Company 2 Account to Malaysian Official 2, 1MDB Official 4 and 1MDB Official 5.   On or about January 15, 2013, Leissner again emailed his close relative from his personal account, correcting some banking information and adding a transfer to 1MDB Official 2.

a.      On or about December 7, 2012, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by Malaysian Official 2.

b.      Between on or about December 7, 2012 and on or about December 20, 2012, Leissner directed approximately $700,000 to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 5 and his close relative.

c.      On or about December 20, 2012, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 1.

   d.  Also on or about January 17, 2013, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 4.

   e.  On or about January 17, 2013, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 2.

Project Catalyze

   60.  In or about November 2012, almost immediately after Project Maximus closed, Leissner[4] and Low began working on another bond issuance.   Ultimately, Goldman underwrote a third bond issuance that raised an additional $3 billion for 1MDB with Goldman acting as arranger and underwriter.   This bond issuance was purportedly intended to fund 1MDB's portion of a joint venture with Aabar.

   61.  Goldman's control functions had continued suspicions that Low was working on the third bond deal.   Once again, however, the control functions relied solely on the deal team members' denials of Low's involvement without any further scrutiny.

   62.  On or about April 24, 2013, a senior Goldman executive who was a member of Goldman's approval committee located in New York, New York, emailed Leissner about "1MDB," asking: "Is there a story circulating about an intermediary on the Magnolia trades??"   Leissner responded, "Not that I am aware of . . . There definitely was no intermediary on any of the trades.   The blogs in Malaysia always try to link a young Chinese business man [sic], Jho Low, to 1MDB.   That is not the case other than he was an advisor alongside other

---

[4] Ng had a new position within Goldman by this time and did not work directly on the deal team for Project Catalyze, but was recognized by Goldman as a continued contact point for 1MDB.

prominent figures to the King of Malaysia at the time of the creation of 1MDB." There was no follow-up by Goldman's control functions about Low.

63.     Goldman also failed to address the other red flags that were raised by the proposed $3 billion transaction, including, once again, 1MDB raising large sums of money with no identified use of proceeds within months of Project Magnolia and Project Maximus, and Goldman's failure to verify use of past bond proceeds. Adding to the transaction's risks was the upcoming Malaysian general election, which directly affected the political future of Malaysian Official 1.

64.     Goldman's committees nevertheless approved Project Catalyze on or about March 13, 2013, and the proceeds from Project Catalyze were issued on or about March 19, 2013. Goldman purchased the entire bond issuance from 1MDB and booked approximately $279,000,000 in fees on Project Catalyze.

65.     Low and Leissner continued to pay bribes to government officials from the bond proceeds. On or about March 19, 2013, Goldman transferred via wire from and through the United States approximately $2.7 billion from Project Catalyze to an account for another 1MDB subsidiary ("1MDB Subsidiary 3") at Foreign Financial Institution A. Subsequently, Low caused approximately $1,440,188,045 to be transferred through a series of pass-through accounts to accounts beneficially owned or controlled by Low and Individual 1. Low then directed multiple transfers to various government officials, including:

a.     On or about March 21, 2013, approximately $620 million was transferred from a shell entity beneficially owned or controlled by Low, Shell Company Account 7, to an account beneficially owned and controlled by Malaysian Official 1. Four days later, on

or about March 25, 2013, another approximately $61 million was transferred from Shell Company Account 7 to the same account for Malaysian Official 1.

b.      On or about April 5, 2013, approximately $10 million was transferred from Shell Company Account 8, an account beneficially owned and controlled by Low, to an account beneficially owned and controlled by Abu Dhabi Official 2.

c.      On or about July 1, 2013, approximately $1 million was transferred from Shell Company Account 8 to an account beneficially owned and controlled by 1MDB Official 5.

d.      On or about October 21, 2013, approximately $11.5 million was transferred from Shell Company Account 8 to Shell Company Account 3.

e.      On or about September 11, 2013, approximately $1 million was transferred from Shell Company Account 8 to an account beneficially owned and controlled by 1MDB Official 1.

f.      On or about September 11, 2013, approximately $1 million was transferred from Shell Company Account 8 to an account beneficially owned and controlled by Malaysian Official 2.

g.      On or about September 11, 2013, approximately $980,000 was transferred from Shell Company Account 8 to an account beneficially owned and controlled by Malaysian Official 3.

h.      On or about September 11, 2013, approximately $895,000 was transferred from Shell Company Account 8 to an account beneficially owned and controlled by Malaysian Official 4.

24

i.      On or about July 3, 2013, approximately $65.1 million was transferred from Shell Company Account 8 to Holding Company 2 Account.   From there, Leissner directed payment of approximately $4.2 million to Shell Company Account 6, which was beneficially owned by Ng's close relative.

j.      On or about July 29, 2013, approximately $1 million was transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 2.

k.      Also on or about July 29, 2013, approximately $1 million was transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 4.

l.      On or about July 19, 2013, approximately $6 million was transferred from Holding Company 2 Account to another account beneficially owned and controlled by Leissner and his close relative, Management Company 1 Account.   Subsequently, on or about July 22, 2013, approximately $6 million was transferred from Management Company 1 Account to an account beneficially owned and controlled by 1MDB Official 3.

m.      On or about June 27, 2013, Low transferred approximately $30 million from an account he beneficially owned and controlled to an account beneficially owned and controlled by UAE Official 1.

VI.     Other Anticipated 1MDB Deals

66.      After the bond deals were complete, Goldman continued to pursue 1MDB business, including a role in the anticipated 1MDB Energy IPO.   In the pursuit of that additional business, in or about September 2013, Goldman hosted a roundtable in New York for Malaysian Official 1.   Several senior Goldman executives, Leissner, Low, 1MDB Official 3 and others

were scheduled to attend this meeting, though Low did not ultimately attend.   However, during

that trip, a New York jeweler ("Jeweler 1") met with Low and the wife of Malaysian Official 1

in a hotel suite at the Mandarin Oriental Hotel in New York, New York, to show the wife of

Malaysian Official 1 a piece of expensive jewelry that Jeweler 1 had designed for her at Low's

request.

   67. On or about January 13, 2014, 1MDB invited Goldman to submit a

proposal to provide services to 1MDB in connection with the IPO.   Goldman worked on the

proposed IPO through 2014, during which time Low and Leissner continued to make or promise

corrupt payments to government officials, including from Project Catalyze's misappropriated

proceeds.

   68. On or about June 2, 2014, Leissner sent an email to himself at his personal

email account containing a chat between himself and Low in which the two discussed 1MDB

business opportunities that Goldman was trying to win at the time, including the IPO.

Specifically, they discussed how to manage officials at 1MDB to steer additional business to

Goldman, including getting Goldman to serve as a Joint Global Coordinator for the IPO.

    a. For example, Low stated that 1MDB Official 2 and another high-

ranking 1MDB official were unhappy with Goldman for not "deliver[ing]" a loan to 1MDB in

2013, which was ultimately provided by Foreign Financial Institution F.   As a result, according

to Low, 1MDB would only give Goldman a more limited role in the IPO.   Leissner responded

that he "would have delivered" the loan, and expressed frustration that Goldman was concerned

about issues related to 1MDB's delayed financial reporting at the time, declaring "Committee is

stupid!!!"

b.      Low and Leissner then agreed that Leissner would "babysit" 1MDB Official 2 and the high-ranking 1MDB official, and Low would "manage via [1MDB Board of Directors]."   Leissner also noted that neither named official provided "much of value" but that they "need[ed] to suck up to them."

c.      Low and Leissner also discussed sending "cakes" to "madam boss" and Low asked if he could transfer money to Management Company 1 Account so that Leissner could "settle madam cakes 2."   Low asked Leissner, "Do u mind if funds go [from] [Shell Company 1] to u [sic] direct at [Management Company 1]?   Or u [sic] think too sensitive?" Leissner responded, "[Shell Company 1] is ok too.   But need to get it out asap.   Best today. Because I am seriously in trouble."

d.      Low and Leissner further discussed Leissner's continued efforts to onboard Low as a formal Goldman client.   Leissner explained he would "push harder" for Low once Leissner was confirmed as Goldman's Southeast Asia Chairman of the Investment Banking Division.

69.      On or about June 2, 2014, approximately $1.215 million was transferred from Shell Company Account 8 to Management Company 1 Account.

70.      On or about October 10, 2014, Leissner caused approximately $4.1 million to be transferred from Management Company 1 Account to Jeweler 1 in New York, New York, in part to pay for approximately $1.3 million in jewelry that had been purchased on or about January 3, 2014 by the wife of Malaysian Official 1 while she, Malaysian Official 1 and Low were in the United States.

71.     On or about October 14, 2014, Leissner transferred approximately

$600,000 from Holding Company 2 Account to an account beneficially owned and controlled by

Abu Dhabi Official 2 and his close relative.

72.     Also on or about October 14, 2014, Leissner transferred approximately

$3.5 million from Holding Company 2 Account to the business account of an associate of

Malaysian Official 1's relative.

VII.     Additional Failures of Goldman's Control Functions

73.     After the bond deals were completed, in or about and between March 2013

and February 2016, additional red flags were raised in the press and on internal phone calls

among Goldman's employees and executives about Low's involvement in the deals and the

possible payment of bribes in connection with the deals.   Goldman failed to investigate these red

flags or to perform an internal review of its role in the bond deals despite the clear implication

that the deals had involved criminal wrongdoing.   Further, high ranking employees of Goldman

failed to escalate concerns about bribery and other criminal conduct related to the bond deals

pursuant to Goldman's escalation policy, which required that any Goldman employee who

became aware of any conduct that could raise, among others, "a legal, compliance, reputational,

ethical, accounting, [or] internal accounting control" issue to report such conduct immediately to

a supervisor and Goldman's control functions.

74.     Specifically, in or about May 2013, a Goldman PMD ("Employee 3") who

had been involved in the 1MDB deals, discussed the deals in a series of phone calls with

Goldman senior executives that were recorded on Goldman phone lines.   For example, on or

about May 8, 2013, Employee 3 called a senior Goldman executive about, among other things,

Project Catalyze.   Employee 3 stated, "the main reason for the delay for [IPIC] not having

funded their three billion into the JV with 1MDB is [Abu Dhabi Official 1] is trying to get something on the side in his pocket."   He continued later, "I think it's quite disturbing to have come across this piece of information . . . ."   The senior Goldman executive replied, "What's disturbing about that?   It's nothing new, is it?"   In response, Employee 3 agreed that the situation was nothing new.    Employee 3 had at least one substantially similar phone conversation with at least one other senior Goldman executive.

75.    Subsequently, in May 2015 and again in October 2015, amid negative media reporting linking Low with the 1MDB bond deals and Malaysian Official 1, Goldman executives and employees discussed Low's involvement in the 1MDB deals.   For example, on a recorded call on or about October 13, 2015, Employee 3 told the senior Goldman executive that a senior IPIC officer had informed his subordinate that "there are a number of key people who are involved in, let's call it the situation.   [Abu Dhabi Official 1] is one.   Jho Low for sure.   He thinks Jho Low is the leader of the pack.   And he has a very strong view that [Leissner] is involved."   The control functions never took steps to address these red flags.

76.    There were also subsequent emails and recorded phone calls between Employee 3 and senior Goldman executives in the control functions about the disparity between how due diligence and risk issues were handled on various deals.   In particular, they discussed the unusual latitude granted to certain employees, such as Leissner and Employee 1.

77.    For example, in or about January 2016, on a recorded call between Employee 2, who had been involved in BIG's review of each of the relevant transactions, and Employee 3, they discussed, among other things, Leissner's conduct, including Leissner's false statements that Low was not involved in the 1MDB deals.   Employee 2 then noted that there were several similarly "problematic" people from a compliance perspective at Goldman, and

Employee 3 agreed, immediately mentioning Employee 1 as an example of a "problematic"

person.   Employee 3 also noted the "double standard" between the minor repercussions meted

out to favored employees like Leissner and Employee 1 when they got caught trying to

circumvent the control functions, and the more serious repercussions to other, less favored

employees who engaged in similar behavior.   Employee 2 agreed, stating, "Yes, double

standard, and it looks stupid."   In the course of the call, Employee 2 also noted that Leissner's

email communications had been searched as part of an internal investigation into a separate

incident involving the use of an intermediary that occurred subsequent to the 1MDB deals, which

Employee 2 stated "seems to me should have been done ages ago."   Employee 3 similarly

discussed on a recorded call in or about February 2016 with a high-ranking employee in

compliance and MD how repercussions for control functions violations varied radically between

deals.

VIII.   Goldman's Other Low-Related Deals and Contacts

78.     The 1MDB bond deals and underlying acquisitions were not the only

Low-related transactions that Goldman engaged in during the relevant period.   Despite the

negative view that Goldman's control functions took of Low, there were numerous potential and

completed deals with which Low was involved in some manner.

79.     For example, Goldman served as an advisor on a deal in or about 2013

where a Low-related entity was one of the original clients.   The deal was not submitted for due

diligence review until it was substantially finalized.   At that point, BIG raised concerns about

the involvement of the Low-related entity and advised the deal team that the deal should not

proceed if Low was involved as a client, received a fee or had an active role in the deal.

Through his relationship with Abu Dhabi Official 1, Low arranged for another entity to become

Goldman's putative client.   However, Low remained in the deal as a co-investor and an active participant.   Goldman deal team members knew this was merely a technical change in the deal structure, and knew but did not inform BIG of Low's continued involvement in the deal.   BIG employees were later surprised to see press reports that the deal had been completed with Low's involvement in late 2013.   The deal resulted in a multi-million dollar fee for Goldman. Goldman's control functions performed no additional review after the deal was completed.

80.     In addition, senior executives at Goldman had continuing contact with Low during the relevant period.   These contacts included, but were not limited to, a meeting in or about 2009 between a senior Goldman executive and PMD and Malaysian Official 1 that was arranged by Low; a meeting in or about 2012 that was attended by a Goldman senior executive, Abu Dhabi Official 2 and Low, among others; and a meeting on a yacht in Southern France in or about 2013 attended by another senior Goldman executive and PMD, Leissner, Malaysian Official 1 and Low, among others.

## CONSPIRACY TO VIOLATE THE FCPA

81.     The allegations contained in paragraphs one through 80 are realleged and incorporated as if fully set forth in this paragraph.

82.     In or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant GOLDMAN MALAYSIA, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

a.     being an issuer, an employee of an issuer and an agent of an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a

foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of:   (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Goldman and others in obtaining and retaining business for and with, and directing business to, GOLDMAN MALAYSIA and others, contrary to Title 15, United States Code, Section 78dd-1; and

b.	while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce and to commit an act corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign

political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist GOLDMAN MALAYSIA and others in obtaining and retaining business for and with, and directing business to, GOLDMAN MALAYSIA and others, contrary to Title 15, United States Code, Section 78dd-3.

83.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant GOLDMAN MALAYSIA, together with others, committed, and caused to the commission of, among others, at least one of the following:

<u>OVERT ACTS</u>

a.     Between on or about March 25, 2012 and on or about March 29, 2012, Leissner and Ng traveled to Los Angeles, California and New York, New York to discuss matters related to Project Magnolia with Low and others.

b.     On or about April 4, 2012, Leissner falsely stated at a FWCC meeting that Low was not involved in Project Magnolia other than to set up one meeting with IPIC Official 1.   The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.   Ng was also present during this meeting and did not correct Leissner's false statement about Low's involvement.

c.     Between on or about May 29, 2012 and on or about August 1, 2012, Low and others caused approximately $258.75 million traceable to the proceeds of Project Magnolia to be transferred via wire from Shell Company Account 2 through a U.S. correspondent bank to Shell Company Account 4.

d.      On or about October 10, 2012, Leissner falsely told a firmwide committee that neither Low nor any intermediary was involved in Project Maximus.   The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

e.      Between on or about December 6, 2012 and on or about January 21, 2013, Low and others caused approximately $20.5 million traceable to the proceeds of Project Maximus to be transferred from Shell Company Account 2 to Holding Company 2 Account.

f.      On or about December 20, 2012, Leissner directed approximately $1 million traceable to the proceeds of Project Maximus to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 1.

g.      On or about July 22, 2013, Low, Leissner and others caused approximately $6 million traceable to the proceeds of Project Catalyze to be transferred from Management Company 1 Account to an account beneficially owned and controlled by 1MDB Official 3.

h.      On or about July 29, 2013, Low, Leissner and others caused approximately $1 million traceable to the proceeds of Project Catalyze to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 2.

i.      On or about October 10, 2014, Leissner caused approximately $4.1 million to be transferred from Management Company 1 Account to Jeweler 1 in New

York, New York, in part to pay for approximately $1.3 million in jewelry for the wife of

Malaysian Official 1.

(Title 18, United States Code, Sections 371 and 3551 et seq.)


SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York


DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, Department of Justice


DEBORAH L. CONNOR
Chief, Money Laundering and Asset
Recovery Section
Criminal Division, Department of Justice